## In re THE LITERARY DIGEST, Inc.
### No. 363.

Circuit Court of Appeals, Second Circuit.
July 10, 1939.

958

Zalkin & Cohen, of New York City (Israel Akselrod and Barney B. Fensterstock, both of New York City, of counsel), for appellant.

.Brodek & Eisner, of New York City (Charles A. Brodek and Louis P. Eisner, both of New York City, of counsel), for appellee.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

SWAN, Circuit Judge.

In March, 1938, The Literary Digest, Inc., originally incorporated under the name of Review of Reviews Corporation, filed a voluntary petition under section 77B of the Bankruptcy Act. In May, 1938, the corporation was adjudged insolvent and liquidation was ordered. Thereafter Dr. Albert Shaw filed a proof of claim as a creditor which was allowed in the sum of $140,500. The trustee of the debtor has appealed. Whether allowance of the claim was correct turns upon the interpretation and legal effect of the language used in the documents upon which the claim is based.

It is based upon an instrument dated October 15, 1937, entitled "Income Note", and paragraph 4 of a contract incorporated therein by reference. The income note recites that the corporation "hereby certifies that it is indebted" to Dr. Albert Shaw in the sum of $140,500 "for money heretofore loaned and advanced unto it, which amount it hereby promises and agrees to pay at its office in said Borough of Manhattan, without interest, from the available net income (as hereinafter defined) of the Company, and not otherwise, except as appears. in paragraph 4 of an agreement dated October 15th, 1937" between the company, Dr. Shaw and others. By subsequent provisions available net income is defined to mean 25% of net income earned up to December 31, 1939, and larger percentages in later years; and the company agrees to cause its board of directors to ascertain and declare the amount of net income during each six months' period ending on the last day of May and November in each year, and to pay the available net income to the holder of the note on the first days of July and January respectively. If a default occurs in ascertaining and declaring the amount of net income applicable to payment, or in making payment of the amount declared payable, the note holder may make a written demand that the default be cured and, if it be not cured within 30 days thereafter, then upon demand the "unpaid principal shall become immediately due and payable; and the Company covenants that it will then immediately pay the same, anything hereinbefore to the contrary notwithstanding."

To understand the circumstances under which this income note was executed reference must be made to the contract of October 15, 1937, of which the note makes mention. Prior to that date Dr. Shaw was the owner of the entire outstanding capital stock of the company and had advanced to it $640,500, such advances being evidenced by its demand notes. He and his two sons desired to retire as officers and directors of the company and to acquire the name Review of Reviews, the book business of the company, and its library. Three other parties to the agreement, Havell, Norton and Page, were to take their places as officers and directors, change the name of the corporation to The Literary Digest, Inc., and continue the publication of its weekly magazine called The Digest. To make this possible it was necessary to reduce the current liabilities of the corporation. The contract of October 15, 1937, covered these arrangements. Dr. Shaw assigned all his stock in the company to Havell, Norton and

Page and they became officers and directors; he also assigned to them, without recourse, $500,000 of the company's demand notes, which they delivered to the company in exchange for new notes executed by it. These new notes were to be payable only upon its "dissolution, reorganization, bankruptcy or other or different liquidation" and were to "remain subordinate" to all other debts. Dr. Shaw surrendered to the company $140,500 of its demand notes, representing the balance of his advances, and received the income note above described. The company conveyed to Dr. Shaw and his sons the exclusive right to the name Review of Reviews, its book business and library and certain other chattels. Paragraph 4 of the contract of October 15th, which the income note incorporates by reference, reads as follows:

"Irrespective of whether or not the Company has any net income or available net income, Dr. Shaw, Shaw, Jr., and Shaw, or any one or more of them, or any person, firm or corporation with which they or any of them shall be associated in business, and at the election of any of them, the publisher of any book or books of which they or any of them shall be the author or co-author, shall have the right to use not more than one-third of a page of advertising in any future issue or issues of The Digest (or its successor magazine or any magazine with which it may hereafter be combined or merged) at the established card rate less 20%, and the price of such space shall be credited against the aforesaid income note and shall be payable in no other manner. The Company shall have the usual right to edit such advertising matter. As such advertising space is utilized by Dr. Shaw, Shaw, Jr., and/or Shaw, each of them is authorized by Dr. Shaw to acknowledge in his name and behalf the reduction in the principal amount of said note by the adjusted price of the space so used, and to credit the said price against said note."

The testimony shows that the established card rate for advertising space in the company's magazine varied with its circulation and was probably $1,200 per page in October, 1937. At no time did Dr. Shaw or either of his sons seek to place any advertising pursuant to the rights accorded them by said paragraph 4. Publication of the company's magazine was suspended with the issue of February 19, 1938.

It is conceded that a promise to pay out of an uncertain fund, such as income to be earned, creates no claim provable in bankruptcy, if the fund never arises. Synnott v. Tombstone Consol. Mines Co., 9 Cir., 208 F. 251; In re 35% Automobile Supply Co., D.C., 247 F. 377; G. B. McAbee Powder & Oil Co. v. Penn-American Gas Coal Co., 3 Cir., 295 F. 630; In re Hawkeye Oil Co., D.C., 19 F.2d 151. But the claimant argues that the income note contains an alternative promise to pay either out of available net income or by supplying advertising space in the company's magazine; that its insolvency and abandonment of publication constituted a breach of an implied obligation to continue publication of its magazine so that advertising space would be available for the claimant's use if he should wish it, and that the damages for breach of such implied obligation were the full amount of the income note. The district judge accepted these contentions, relying upon the supposed analogy of the case where a person pays in advance for merchandise to be delivered in the future and bankruptcy prevents fulfillment of the seller's contract. We are unable to agree that the analogy is apposite or that the claimant's interpretation of the written documents is correct.

We think it evident that the new notes which the company gave in exchange for surrender of its demand notes evidencing Dr. Shaw's prior advances of $640,500 were intended to be subordinated to other debts of the company in case of bankruptcy. As to the notes made payable to Havell, Norton and Page it was expressly so provided. A similar intent was manifested with respect to Dr. Shaw's new note, since it was to be paid out of income, and was to become a fixed and absolute obligation only on the contingency of a failure, after written demand, to cure a default in declaring or paying over the available net income applicable to payment. The naming of this one condition for accelerating and making absolute the company's duty to pay the face amount of the note impliedly negatives any inference that bankruptcy should have a like effect. Moreover, in an escrow agreement which Dr. Shaw executed contemporaneously with the contract of October 15, 1937, it was provided that if the company should

"definitely suspend publication of The Digest, or any successor publication of said corporation", the funds then held in escrow were to be returned to Dr. Shaw. Thus, the parties expressly contemplated the possibility of the company suspending publication, and if such an event had been intended to have any effect upon payment of the income note, it is likely that a provision on the subject would have been inserted in the note or in paragraph 4 of the contract of October 15th. We cannot read the documents as expressing a promise to pay the note or, in the alternative, to furnish $140,500 of advertising space. By paragraph 4 the company promised merely to fill advertising orders, if placed, in a limited amount and at a discount below its established rate, and to allow Dr. Shaw and his sons to pay for such advertising by giving credit on the income note. The income note was obviously the primary obligation, to which the option given by paragraph 4 to place a small amount of advertising on favorable terms and to credit the charge therefor upon the note was merely ancillary. Its purpose was to prevent the company from collecting payment for advertising placed by the Shaws and their nominees, while the income note remained unpaid. It must be conceded that there is as much reason to imply an obligation to continue in business in order that the company might earn income, as there is to imply one in order that it might furnish advertising to be credited upon the note. If breach of the former was to create no claim provable in bankruptcy, it is incredible that the parties intended breach of the latter to have that effect.

The analogy relied upon by the district court is not in point. There the purchaser paid in advance for goods to be delivered in the future; the seller's duty to deliver goods paid for is absolute. Here no advertising has been paid for in advance; the company's duty to furnish advertising space is contingent on future orders which the claimant may never place, and his loss resulting from rejection of any order that might be placed is incapable of definite computation since the charge therefor depends upon a rate which fluctuates with the number of subscribers to the magazine. Under such circumstances we do not think an obligation to continue in business despite insolvency can be implied (see In re 35% Automobile Supply Co., D.C., 247 F. 377, 379), but if it can, a claim based on the breach thereof is too contingent and speculative in amount to be capable of proof in bankruptcy. The order allowing the claim of the appellee must be reversed and the claim expunged. It is so ordered.